**CARGILL, INC., Appellant,**

v.

**CONTINENTAL GRAIN COMPANY,
Appellee.**

**No. 16607.**

Court of Civil Appeals of Texas.

Fort Worth.

Feb. 12, 1965.

Rehearing Denied March 19, 1965.

Gayle E. Oler and Jay S. Fichtner, Dallas, for appellant.

Allison, Mann & Allison, and Earl R. Allison, Levelland, for appellee.

LANGDON, Justice.

This is an interpleader suit by Continental Grain Company against C. G. Israel, Cargill, Inc., and Ruben Leach, d/b/a Fargo Grain Company.

Leach purchased some grain from Cargill. Continental purchased the grain from Leach and in payment therefor gave Leach its draft, dated March 1, 1962, payable to Fargo Grain Co., in the sum of $4,344.63. Israel hauled the grain from the point of purchase to Houston, Texas, where Continental took title to it. Leach did not pay Cargill for the grain or Israel for hauling it.

Because of the money owed them for grain and hauling respectively, Cargill and Israel, each acting independently of the other, made intensive efforts to locate Leach. Cargill found him first on March 14, 1962, and sought to induce him to endorse the Continental draft to it in payment for the grain. Leach advised that the draft had been lost. At Cargill's suggestion Leach called and confirmed in writing a request to Continental that it stop payment on the lost draft and issue a replacement draft payable to Cargill or to him and Cargill, whichever would better suit its bookkeeping requirements. Continental agreed to do so. Israel had no notice of these oral and written instructions. Continental acknowledged the instructions to stop payment but did not immediately issue a replacement draft.

In the meantime, on March 30, 1962, before Continental issued the replacement draft, Israel finally located Leach. On this occasion Leach had the original Continental draft, on which he had stopped payment, in his possession. The draft was complete and regular on its face and unconditional. Leach endorsed the draft and tendered it to Israel in payment of the hauling debt. Having no notice of the stop payment or other instructions relating to the draft, Israel endorsed it and requested his son to cash it at his bank. Israel, upon receiving the cash, took the sum of $660.00 due him and paid the balance in cash to Leach.

The draft was later returned by the bank because its payment had been stopped. At this point Continental, which had not yet issued the second draft, and being confronted with adverse claims to the money by Israel and Cargill, impleaded all parties and paid the monies owed by it into the registry of the court. Both Leach and Continental were dismissed from the case, leaving Cargill and Israel in the controversy for the money.

The trial was to a jury. It found that the original draft was negotiated from Leach to Israel within a reasonable time considering the nature of the instrument and the usage in the trade and that Israel in taking the draft had not acted in bad faith. Based upon the verdict, judgment was entered by which Continental was awarded its attorney's fees in the sum of $350.00 and discharged. The balance of the money, amounting to $3,994.63, was awarded to Israel. Cargill took nothing. We affirm.

By ten points of error appellant contends the court erred in (1) granting Israel judgment for the total amount of the draft; (2) failing to render judgment for Cargill for all funds in excess of $660.00; (3) submitting special issue No. 2 and in failing to give a proper definition of "bad faith" in connection therewith; (4) refusing to submit its requested issue inquiring whether Leach had instructed Continental to pay Cargill the money it owed him; (5) failing to submit requested issues in support of its contention that Israel was an accommodation endorser rather than a holder in due course; (6 and 7) failing to submit issues to the effect that cash grain drafts are ordinarily presented for payment substantially less than thirty days, and as to Israel's experience in buying and selling grain; (8) refusing to submit requested instruction on reasonable time for negotiating draft in connection with Special Issue No. 1; (9) rendering judgment on the verdict because there was no evidence, or (10) insufficient evidence to support the jury's answers to the issues submitted.

Article 5935, § 52, Vernon's Ann.Civ.St., of the Negotiable Instruments Act, defines

a holder in due course as one who has taken the instrument under the following conditions: (1) that it is complete and regular upon its face; (2) that he became the holder before it was overdue and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.

Under Section 56 of Art. 5935, supra, "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

 It is undisputed that the draft in question was complete and regular upon its face and unconditional. It was not overdue. The jury found it was negotiated within a reasonable time. W. L. Holder, executive assistant to Continental Grain Co., testified that quite a few of the Continental drafts were delayed thirty days or more. There was nothing unusual in one coming back after thirty days. His Company had some outstanding at the time which were several months old. This was all right with his Company as long as there were no changes in the drafts on presentment. He estimated 5% or more, perhaps 10%, of their drafts would be outstanding a rather irregular and indefinite period of time.

Israel took the draft in good faith and for value. He was out the $660.00 due him plus the cash he handed Leach for the draft. Without question he paid full value. "Although payment of a valuable consideration is essential to the protection of the purchaser, it is not necessary that the consideration be full and adequate. * * *" 9 Tex.Jur.2d, p. 114, § 99.

The jury found that he had not acted in bad faith. The record reflects that Israel was familiar with Continental drafts. He had always found them to be "okay". He relied on the one in question as being "okay". It was complete and regular on its face. He had no knowledge, actual or otherwise, of any defects in the payee's title. 9 Tex.Jur.2d, pp. 111–113, § 98.

The appellant contends that Israel was an accommodation endorser and not a holder in due course and that therefore he is entitled to all of the proceeds by virtue of the March 14, 1962 assignment or the amount of the proceeds in excess of $660.00.

On the question of assignment the appellant relies mainly on the case of Clay-Butler Lumber Co. v. W. R. Pickering Lumber Co., Tex.Civ.App., 264 S.W. 267, affirmed in 276 S.W. 664 by the Commission of Appeals in an opinion adopted by the Supreme Court. That case involved an assignment of a debt and check in payment thereof. Suit was filed based on the assignment and Clay-Butler intervened, claiming to succeed to the rights of a Cross Plains Bank as a holder in due course, whereas the Bank was serving only as a collection agency. Neither Clay-Butler nor the Bank paid any money for the check involved. Neither was therefore a holder in due course. See 9 Tex.Jur.2d, p. 127, § 110 (Bank as holder in due course) and cited authorities.

We find no application of the Clay-Butler case, supra, or other cases cited by appellant to the facts of this case.

 Finding, as we do, that Israel is a holder in due course, it follows that as holder of the draft, which at the time of its acquisition was complete and regular upon its face, he is presumed to have acquired the draft in compliance with the conditions enumerated under Section 52 of Art. 5935, supra. 9 Tex.Jur.2d, p. 110, § 97.

"* * * Where value has at any time been given for the instrument, the holder is deemed a holder for value in respect to all parties who became such prior to that time. The extinguishment, in whole or in part,

of a past-due debt is a valuable consideration for the transfer of commercial paper * * *." 9 Tex.Jur.2d, p. 109, § 96.

"A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon." Art. 5935, § 57, V.A.C.S.

"* * * This is an elementary rule of the law merchant and was applied prior to the enactment of the Uniform Negotiable Instruments Act. It is of course essential that the instrument should be negotiable in order to entitle a holder to protection as a holder in due course. * * *" 9 Tex. Jur.2d, p. 128, § 111.

A holder in due course is entitled to recover against the maker, notwithstanding there may be a good defense to the instrument against the payee. The burden of proof is on the one who denies that the instrument is held in due course to establish this fact by a preponderance of the evidence. 9 Tex.Jur.2d, pp. 307–308, § 282.

Since it is undisputed that Leach did instruct Continental on March 14 to stop payment on the draft and to issue a replacement draft payable to appellant, it was not error for the court to refuse submission of an issue on the matter.

We have concluded that there was no evidence to show that Israel's knowledge was such as to evince bad faith in the taking of the draft. However a proper issue and instruction thereon was submitted to the jury and answered favorably to Israel. The court did not err in refusing to submit the issue and instruction of the appellant. 9 Tex.Jur.2d, pp. 348–349, § 312; Section 56, Art. 5935, V.A.C.S. (Negotiable Instruments Act).

There was no evidence to support the issue on accommodation endorser. The court's instruction in connection with Spe-cial Issue No. 1 as to reasonable time for negotiation was proper. Other issues requested by appellant were evidentiary in nature and were properly refused.

 In deciding the "no evidence" points, this Court has viewed the evidence in its most favorable light in support of the findings of vital facts considering only the evidence and the inferences which support the findings and rejecting the evidence and inferences contrary thereto. In doing so, we concluded there is ample evidence to support the jury's findings. In considering the evidence in its entirety we have concluded that the jury's findings are not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.

All points of error are overruled and the judgment of the trial court is affirmed.

Affirmed.